It's only the second time, but I'm going to try to institute a local rule saying that every one of my panels has to include Judge Giovanni. I think I've only been with Judge Aldister maybe the third time? Third time in 11 years. Yeah. Try to keep us great beards apart from one another. Now that we've had the in-house bantering, Counselor, thank you very much for bearing with us. This is a matter of, and I'm sorry about the names, I'll just say Chen and Gow versus the Attorney General. I always confuse which is the surname and which is not the surname, but the Chinese name. You may proceed. May it please the Court, Gary Yerman on behalf of Petitioner. I would respect the request of five minutes for rebuttal time. Okay. Let me ask your clients. Neither one has an advanced degree or a college education. Your Honor, the second part is correct. Neither one has an advanced degree or college education. They both entered illegally. One using their own passport without a visa. The other one entered without inspection. Okay. May I ask that because there seems to be some issue about the scope of the policy, the profile, and how it would apply to their province. Fuzhuan province, is that how it's called? Correct. Fuzhuan. Correct me if I'm wrong, and I'll ask Ms. Moore, who maybe I should address this to more appropriately. It seems to me that to the extent that there's some issue or ambiguity about the scope of the enforcement of the application of an enforcement of the family planning policy of the one child policy in China, as applied to Ms. Gao's province, Fuzhuan, that it seems as though there's some kind of policy in effect to try to encourage persons with college degrees to come back to China, and there's been some relaxing of the one child policy based around those kinds of considerations. Exactly, Your Honor. That is the dispositive issue, and to people who are here lawfully as either college students or master's degree students, or those people who are here as lawful permanent residents, what China does not do is recognize dual citizenship. So if somebody such as the petitioner and his wife are here illegally and have children, it is supported by the profile that these children are considered Chinese nationals, Chinese citizens upon their return to China, and therefore they're counted towards the one child policy, which I believe is not in dispute as to the existence, and we believe that the BIA erred in their decision overturning the immigration judge in his grant of their case for a political asylum, in that the BIA failed to point down or even discuss the portions of the profile which discuss this issue of people here who have U.S. citizen children but are here illegally or with specific status. Where in the profile is that discussed? It's on page 31, as it's cited by the immigration judge on page 72 of the record. The immigration judge specifically discussed the profile, and I may quote him on page 71 of the record. I believe that the language of the profile of asylum claims and country conditions, Exhibit 6, gives us some significant guidance as to what could happen to this couple on return to China. This document is a very important document in this case, and the court under board precedent decisions must give due deference to the profile submitted to the court by the United States Department of State. The profile of asylum claims and country conditions actually deals with persons who have children in the United States, Exhibit 6, page 31, paragraph 4th paragraph. So the immigration judge reviewed the entire profile before deciding, making his decision. However, the BIA did not. What the BIA did is only look at portions of the profile and parsed what they thought was relevant together in overturning the immigration judge, and we believe the BIA's decision is not supported by substantial evidence, and this court should feel compelled to remand it and overturn their decision because of that. This paragraph goes to word zero. Can you hear me? This is Judge Armstrong. I want to get into this question of substantial evidence. It seems to me there is no quarrel about findings of fact. Both sides agree as to the facts. Yes, Your Honor. All right. That being the case, substantial evidence should not standard of review. The board held that the petitioners did not meet their burden. Therefore, it's a question of law, and therefore, the standard of review in this case is De Nova. That is correct, Your Honor, and we believe a De Nova review of the board's decision by There is a reasonable possibility that these people, upon their return, will be subject to the One Child Policy Plan because they are here unlawfully, not in status, and their children, therefore, will be counted as Chinese citizens upon their return to China. Again, I'm sorry I'm interrupting you. This court does not, in a published opinion, issue if one spouse is on the other spouse. As it states here, the wife petitioner must claim asylum because of statute of limitations. However, the spouse can argue in her behalf. Now, the other courts of appeal have held that that's proper for the spouse to do that. I correct that we have not had a decision in this court on that issue? You are correct in that, Your Honor, that this court has not specifically addressed that issue, but you're also correct in that the spouse, the female spouse, is entitled as a derivative under the board decision of CYZ to be entitled to a grant if Chen, the male spouse, is granted asylum. So that would be, it's that problem for the female spouse. Well, how would that work in this context? Because the fear of persecution, I guess it would be vicarious. The fear of persecution here, the way I'm looking at the arrear amendments, would really go to her well-founded fear. They both can argue the impact of the policy as far as limits the number of children they can have. But that, I'm not certain, is as clear as far as persecution goes as the insertion of the IUD, which would pretty much, I think, get into the language the Congress used in passing the amendment. That's really her argument in terms of the well-founded fear of persecution. You're saying that even though that is her well-founded fear, she can take advantage of that if he is the one making the claim, if he argues that her well-founded fear is sufficient to allow him withholding from removal? Is that what you're arguing? Yes, Your Honor, for political asylum, not just for withholding from removal. Well, it's probably asylum because of the time limitations. Right, but under withholding, yes, that would be his argument because any abortion or future sterilization is a persecution upon her as well as him as the spouse of a person who is being persecuted through sterilization or abortion. And the Board reaffirmed that in the matter of SLL recently in saying that a spouse is entitled to the same protection if the marriage is recognized by the Chinese government. Now, this Court, in reviewing the program... I'm... Excuse me. I got a little confused there. Sure. I didn't really follow what you were saying. Okay. I understand that the forced abortion, forced sterilization affects both spouses. I didn't understand your argument with regard to IUD. Well, if the female spouse, if the female, well, in this case, is required to wear an IUD, that's the act of forced coercive family planning, and the male spouse could be granted asylum or, excuse me, withholding based upon the fact that his wife would be subject to a coerced family planning policy. I see. Okay. Thank you. Okay. Now, this Court, in reviewing the profile, has said in, quote, 386-3556, that the Board's analysis failed to account for differences in enforcement based on immigrants, on an immigrant's legal status in the United States. The 1998 profile references anecdotal evidence to that effect. That, quote, possession or lack of possession of U.S. permanent residence status is the key criterion for determining whether couples are subject to family planning restrictions, end quote. So where this Court reviewed the whole profile and determined the legitimacy of a claim that somebody who's returning with overseas children will be counted towards a family planning,  And by doing so, we believe this Court, in their de novo review, should overturn the BIA's decision to remand it back to the immigration judge to reinstate the previous decision of asylum. I remind the Court that the burden for the petitioner is a reasonable possibility, and that is not a very high burden. A reasonable possibility is the objective standard, and the profile, along with other evidence, and I know this Court will not look at evidence outside the record, but the evidence clearly states that there's a family planning policy, that China does not have dual citizenship, that those people here illegally who return do not fall in under any of the exceptions. And just because the Chinese government does not tell the U.S. government of all the acts of abortion sterilizations that occur does not mean it doesn't happen. This is a closed communist society. They're not going to disclose this to us or any other foreign government. Given the nature of the kind of questions that are before us, with regard to this issue of the missing transcript, is there really anything in that transcript that we need or the BIA would need on remand? I don't believe so, Your Honor. I believe what's important is the background evidence that was submitted, which mainly here is the 1998 profile. I'm sure this Court is aware of all the recent country reports that have come out since the 1998 profile which cited thousands in the last year, 2005 country report, thousands of abortions and sterilizations last year that occurred, and millions over the last couple of years. You said you're sure aware of it, but you're right. It's not in the record. It's not something we can consider. I understand, and I will withdraw that part of my argument. Your Honor, I would ask that I be given a five-minute rebuttal time to answer any questions. Okay. Thank you. May I prove? Yes. Good afternoon, Your Honor. Good afternoon. May it please the Court, my name is Brooke Maurer. I'm for the Attorney General. And it appears that the issue before the Court today is whether the country reports on the record compel the conclusion that petitioners had a well-founded fear of future persecution and a clear probability of forced sterilization or forced abortion. And the evidence in record supports the Board's finding that there was no well-founded fear or clear probability of future persecution through forced sterilization, abortion, or a forced IUD insertion. Well, it also says, or resistance to those family policies could also constitute persecution. If you're being treated in a particular way, not only having sterilization or the IUD, but if you're resisting those policies, but I guess this is not a case of resistance. That would be, this would be more of the IUD in the course of policy itself as opposed to resistance to the policy. That is correct, yes. What should we do with the profile discussion about the existence of the policy, particularly in the province that most applies to them? And am I incorrect that I'm reading the exclusions to that policy or the exceptions to that policy as China's attempt to try to encourage Chinese citizens who have higher education to return to China? And that would not apply to either of these two? Well, no, they would not apply because neither one of them have advanced degrees, and they will go in there. But I did want to clarify, as far as the same reports in the administrative record on page 300, what he was referring to earlier as the one-child ban, and there was actually, in the report itself, said that there was actually no report of a natural policy in respect to children born outside of China in the United States, where that would be applicable in the same way. But why wouldn't it be applicable? These are going to be Chinese citizens when they're back. The kids are going to be Chinese citizens. The couple clearly will be viewed as having a child already when they come back. What difference would it make to the policy that this child was born in the United States as opposed to being born in China? Why wouldn't they be treated the same way? Well, at the time this report came before the board, the policy wasn't actually in place. That policy came later in, like, 2002 when the policy was actually announced and went public. So in this report, there is actually no policy that China adopted about the one child. That came later. Well, I'm looking at it, and the pages are not consistent. I'm looking at something on the top of which is the number 31. It's page 31 of some document, and the heading is China, colon, Profile of Asylum Claims and Country Conditions, and it appears to be the United States Department of State report dated April 14, 1998, and the caption on the table of contents is China, Profile of Asylum Claims and Country Conditions. And unless I'm misreading it, they clearly have a discussion in here which leads me to think that there's a national policy, which is one thing, and then pressure, sometimes intense pressure, put on local administrators, which is sometimes a very different thing, and that local administrators have quotas in terms of the number of children being born in their provinces, and that the local politicians or officials will oftentimes go beyond what the policy authorizes in enforcing the policy in their province. So if I'm right about that, why wouldn't that in and of itself give rise to a well-founded fear?  It states that the Chinese government prohibits the use of force to compel a person to submit to abortion or sterilization, and there are those rogue officials that do go through with that, but they do not condone the practice of forced abortion. But I think that argument is much more difficult for the petitioner to make, and that's why I tried to focus in on the IUD, and not look at this in terms of forced sterilization or forced abortion, but the forced insertion of an IUD, which under the Act is the same thing. Why wouldn't there be a realistic or well-founded fear, if they go back, given their family status, that she will have to have an IUD inserted? Well, I think it also states that such IUD insertion also comes when there are two, maybe three children, dependent on the sex of the children and the order that they came, when they don't conform to the threat of sanctions or monetary fines, which is also listed on page 294 of the administrative record in that same report. But how does that help you? Well, the petitioner has one child, and she's not necessarily in violation of the one-child principle. No, but they have more children. And there are exceptions within the policy that allows them to have another child in four years, and she's not going back there with the ability to be, you know, they're not forcing her to undergo the IUD insertion. I'm interfering here. I understood that exception to be if it's a girl child. Am I not? The girl child, you may request permission for another child four years later. This was a boy child, right? That is correct. I apologize. Yes. All right, now that I've interrupted you, let me give you my concerns. First, the decision here was that the petitioners did not meet the burden, and the CIA set forth on the variance of enforcement in China, the possibility of non-persecutory methods of enforcement, and the uncertainty about how a child born abroad is treated under the one-child policy. I add to that the statement in the policy saying, as far as this major principle, policy is generally a one-child policy. However, in some southern urban areas, if the parent's first child is female, may apply after a set of years to conceive a second. So you start out with the problem. In the province of the petitioners, the major premise is the policy is generally a one-child policy. That is in the State Department. I'd like you to comment on the things that I've just presented. Thanks. Are you okay, Ms. Barr? A little bit. It was a little bit. If I could clarify. All right. Let me just say it again. First, the board in its decision that the petitioners did not meet the burden gave three reasons, and I repeat it. So it's all in one paragraph. All in one paragraph. I think it's all in one sentence, in the board's opinion. Well, the board using the report. No, the board's reasons first talked about the variance of enforcement. They gave three reasons. Variance of enforcement, the possibility of non-employee methods of enforcement, and the uncertainty about a child born abroad is treated under the one. I didn't understand that. I didn't either. Can you, let me see if I can get ahold of Terry. Terry. Are we not? Judge Onster, can you refer us to the paragraph? Yeah. Then we can focus on that. All right. On page three of their opinion, at the top of the page, it's the one paragraph starting out, in light of the variance of enforcement of the child, the possibility of non-perspiratory methods of enforcement, and the uncertainty about how a child born abroad is treated under the policy. We find that the respondents did not burden approving eligibility. The whole decision, the rationale for the decision, is based on that one sentence. Did you hear me? Did you understand? Yes, I did. And, yes, the board found as a factual matter that the country reports, which it's referring to here, they felt that the future persecution was not likely and that there was no policy available for children born inside of the U.S. I am aware of a, as cited in a footnote in a brief, I am aware of a board's subsequent decision in the matter of CC that thoroughly examined the question of the policy that China has and analyzed it in looking at more recent country reports. However, I do submit that such reports are not before the court as we have the 1998 report. But as they said that in the subsequent, you know, in CC, in matter of CC, that the reports found that China finds it is against the law to forcibly sterilize, abort someone, and no longer continue those practices and instead enforce fines and educational restrictions. Yes, you are taking the view that forced or coerced, obviously not forced, but coerced compliance with a one-child policy does not in and of itself rise to a level of persecution. That's what you're arguing, that it has to be some kind of coercion that would have endemic within it, the kind of treatment that we more traditionally view as persecution, such as forced insertion of an IUD, forced sterilization or abortion. You're saying absent that, and that's, I assume, how you're interpreting the term non-persecutory methods. Let's adopt that term. You're saying if non-persecutory methods are used to force compliance, to coerce compliance with a one-child policy, that is not the kind of persecution that Congress had in mind when it enacted the Amendment to the Sums statute. That's what you're arguing. That's correct. Well, frankly, I'd always viewed these cases as compliance with coerced compliance to China's one-child policy when otherwise somebody brought more than one child, as giving someone an asylum claim if they could prove it. You may be right, Ms. Moore. It's a more narrow view than I had ever taken before. I don't know. You may be right. The end result would certainly be the same. But to the extent that Congress was trying to say that if someone is willing to be sent back to China, and because of their return to China, they're going to have to restrict their family size in a way that they otherwise would not, but for the one-child policy, we recognize that in the United States as grounds for asylum. That's the way I've always viewed that language. But it's not what it says, and you're arguing that that's too liberal of an interpretation of the statute. That is correct. Any other points you want to make? Let's go a little bit, because we took some of your time because of the technical difficulties. Well, as I stated, the recent decision in the matter of CC basically brought forth the more recent reports, and it's also consistent with this court's approach  and look at the current country's conditions, and if this court is not comfortable looking at CC itself for showing how the policies have changed and how they have been altered, they could always remand it back, and the record could be updated in order to include these new policies, where there are no more coerced sterilizations or abortions. When I say no more, this is a huge country. Well, that are not supported or sanctioned by the government. Does the matter of CC do it for its own profits? Does it address that problem? I believe it does, but... The issue, obviously, is a well-founded fear. It's not certainty or anything like that. It's just whether or not he has or she has, through him, a well-founded fear. Given the uncertainty that we seem to have, at least I have, why wouldn't that give rise to a well-founded fear that there's a policy at the national level that may or may not be consistently enforced at the local level? Clearly, there are these history of local people at the provincial level who are under pressure to maintain the size of the local communities through this one-child policy. There are instances in the profile of those local provincial officials going off in a rogue manner and doing things which are inconsistent with the national policy. They may or may not be sanctioned for that, but whether or not they are sanctioned for that, why wouldn't that, in and of itself, give rise to a well-founded fear that, let me say, the IUD would be inserted. Forget the economic coercion. The IUD would be inserted at some reasonably foreseeable point. Maybe not with the second child, but perhaps with the third or the fourth child. Well, we believe that, as far as the application nowadays, it's not the forced... As you said, it's disregarding the economic sanctions, and they're not forcing abortions any longer, and they're no longer forcing the sterilizations or the IUD insertions. They're falling under a uniform country policy, and they're not being isolated or persecuted. Necessarily, it's a uniform country law. All right, Eliza, let me just go back to what Judge Aldous would have asked, because that last paragraph that he's picking up on seems to be interpreted in different ways, and again, focusing on a well-founded fear. We're talking about a variation of enforcement, which was what I just asked you about. The possibility of non-persecutory method... Possibility, not the probability, but the possibility of non-persecutory methods of enforcing this policy, and the uncertainty about how your child is going to be treated. Why wouldn't all that... I've asked this a couple of different ways. I'm not sure I understand your answer. Why wouldn't all that give rise to a well-founded fear, which is the test? Not a belief to a mathematical certainty, perhaps, but at least to a well-founded fear? Well, I believe that the petitioner's speculative claims, I mean, as far as when and if she does have more children, the fact that the methods that they are talking about, non-persecutory, as it goes to what I said to you before, are merely the educational and the monetary fines that they're going to be paying. It's no longer a physical harm or any type of torture or any type of physical restriction on there. If they went through to have those children, and they do proceed to violate the one-child policy, they can do so without physical harm. However, they will have financial and monetary... Consequences. Consequences. Anything else you want to add to that? Ms. Maher, thank you very much. Thank you. If I may address a few issues, beginning with Judge Altschulz's question regarding the BIA decision on page 3 of their decision, page 4 of the record. The BIA in their decision, the first one they said, is that there's the possibility of non-persecutorial methods of enforcement. Sure, there is a possibility of non-persecutorial methods of enforcement. But as Judge McKee aptly pointed out, the standard is, is there a reasonable possibility of persecutorial methods? And we believe the profile exactly answers that question, and the answer is yes. And as the Court knows in the credoso franceco, if we have to put a mathematical equation to it, a reasonable possibility has been termed to be 1 out of 10. So is there a reasonable possibility of non-persecutorial enforcement? Yes, just as there's a reasonable possibility of non-persecutorial enforcement. But we do not have to eliminate the chances of non-persecutorial enforcement. We just have to discuss the issue of whether there is a possibility of persecutorial enforcement. And the second standard, excuse me, reason for the BIA denial, the uncertainty about how a child born abroad is treated under the policy. What uncertainty is there? We've discussed this. Section 231 of the profile discusses the exceptions to children born abroad. There really is no uncertainty. That's why the Board's decision is flawed. As far as matter of CC, those are completely different factual facts, excuse me. The child was a female child. The first child was a female child. The second child came six years later after the first child. So there was no actual violation of any family planning policy because they waited the standard waiting period, whether it's four or five years, depending on the province. And lastly, in matter of CICC, I think the Board was really trying to undermine John Eyre, the demographer, who is since deceased, who testified in front of Congress, the relevance or importance and weight that his affidavit, which was being submitted in these cases, should be given. So, in conclusion, we believe that the statute 110142A is plain meaning in that resistance to forced, coerced population planning is a category that qualifies someone for asylum. We believe that the respondent has provided enough evidence to support his subjectively genuine fear with the profile, and the profile clearly states that his children are not granted any exceptions, and therefore he has met his burden and the BIA's decision is wrong, and the case should be remanded to the immigration judge to reinstate his decision. Do you agree, I assume you do agree, with Ms. Maurer's reading of non-persecutory versus persecutory methods of enforcement? Well, I agree with the theory, but again, we're dealing with a close communist government who is giving out information that they deem important, that they deem relevant. I'm just trying to get a heard reading of the amendment to the statute, that you are agreeing that it's not the fact of the policy which gives rise to a claim, but it's the manner of enforcing that policy which gives rise to a claim for asylum. Well, I think they have to be read conjunctively together in that it's the fact that there is a policy, which in 2002 was codified and became a law, and how the law is effectuated, in that how is it enforced? Well, let's assume it's only enforced through monetary encouragement and discouragement. If that was accurate, then I wouldn't be here before the court today, but unfortunately it's not accurate, and that's why Congress expanded the definition of political asylum to include resistance to family planning, because the facts are clear that China has a one-child policy, and they're enforcing it by whatever means necessary. Okay, that's an answer to a different question. I'm just trying to focus in on the one issue about method of enforcement. Okay, I apologize. If you could just clarify the question one more time, and I'll try to respond. You can clearly enforce that policy in a couple of different ways. One is in a manner which I think we would all agree, and I think Ms. Marr would also agree, is persecutorial, and that is forced sterilization, forced abortion, and then add to that insertion of an IUD, which is further down the threshold but still a pretty severe invasion. Understood. On the other hand, you could be enforced by saying, look, if you don't honor this policy, you've already had one child, you'll never work in this province if you have a second child. In addition to that, this is all theoretical, the tax that we assess on your household will be doubled if you have a second child. Those, what I would call non-persecutorial methods, Ms. Marr is arguing, I think, and please excuse me if I'm not getting this right, that it's not the fact of the policy which gives rise to an asylum claim, it's the method of enforcing that policy which gives rise to it. And therefore, the latter scenario, where you're only being hit with loss of job, being told there's not going to be promoted on your job, perhaps, or some kind of financial ramification by virtue of you not following the policy, on the one hand, she would say, doesn't give rise to an asylum claim. I think that's what she's saying Congress's intent was. I would agree, and I think that the circuit courts have spoken on this, that simply monetary fines are not enough to raise to the level of persecution that the Congress intended. However, there are exceptions to that where the monetary fines rise, excuse me, monetary penalties, rise to such a certain level that then they are considered coercive. But yes, I would agree with that. And lastly, regarding the speculative nature and the fact that they only have a male child, I would remind the court that the Second Circuit has stated that a denial based upon an argument of speculative nature is not warranted unless the female is shown to be medically unable to have any additional children. Okay, thank you. Thank you very much. It was an honor being before this court. Are you privately retained, or is this a pro bono for you? No, I'm privately retained, Your Honor. I mainly practice before the Second Circuit. Okay, well, I hope we see you again. You both did a very fine job, and we don't, unfortunately, we don't always see petitioners in these cases represented by the kind of counsel that their issues really merit. So it's a delight seeing you. Your argument was a big help to us. And, Ms. Morrow, I'm not sure I've seen you before or not, but hopefully we'll see you again. Thank you. Thank you for being here. Take the matter under your advisement. Next case is AARP versus EEOC.